UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:02CR91(AHN) |
| | : | Civ. No. 3:05CV222(AHN) |
| v. | : | |
| | : | |
| MICHAEL MORIARTY | : | |
| | : | April 18, 2005 |

MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER'S
MOTION FOR RELIEF UNDER 28 U.S.C. § 2255

Michael Moriarty, the defendant, petitions for relief under 28 U.S.C. § 2255. His present

petition consists primarily of unsupported summary conclusions with little detail or factual

support which attack the competence of his trial counsel and can be grouped as follows:

(1) alleged failure to conduct sufficient pretrial investigation, including alleged failure to

take additional time to prepare for trial and alleged failure to contact eight unnamed witnesses to

prove the defendant's whereabouts, presumably on the date of the robbery;

(2) alleged failures at trial, including (a) alleged failure to adequately cross-examine

witnesses, including a police officer, regarding alleged contradictory statements; (b) failure to

offer unidentified mitigating evidence; (c) alleged failure to call two unnamed police officers as

witnesses; (d) allegedly improperly causing the defendant to testify at trial because his attorney

had not, as alleged above, called witnesses on behalf of the defendant and effectively rebutted the

prosecution's questioning of prior witnesses, and alleged failure to rebut government's

questioning of the defendant; (e) alleged failure to object to the prosecution's closing argument

that the defendant tailored his testimony to other witness testimony. See Pet. Motion, dated

January 19, 2005. For the reasons discussed below, the defendant's arguments are meritless. In

several instances the defendant's assertions are so unspecific on their face that, without even a review of the record, the court should find a failure to allege a colorable claim.  Because the defendant may make more specific factual allegations in his response, the government respectfully requests an opportunity to more fully brief the issues after the defendant files his response and, if needed, include an affidavit from the defendant's trial counsel regarding the matters at issue.

<u>Procedural Background</u>

On April 2, 2002, a federal grand jury returned a two-count indictment against the defendant Michael Moriarty, charging him with two federal criminal offenses: conspiring with others from January 9 through 13, 1998, to rob the Fleet Bank in Wilton, Connecticut, and attempting to rob that bank on January 13, 1998. GA 343.  At the time of the defendant's arraignment, the defendant was initially represented by the Federal Public Defender's office, which later withdrew from representation because of the illness of one attorney and the departure from the office of another.  In August of 2002, attorney Lawrence Hopkins, who was described by the Court as a "very competent lawyer, very diligent, very conscientious,"  was appointed to represent the defendant.  GA 2-7.   After taking the case, defense counsel spent time reviewing the evidence and, in fact, discussed the matter at length with the goverment, including reviewing all exhibits the government might introduce at trial and discussing various potential motions that defense counsel was considering filing; counsel demonstrated a thorough appreciation of the factual issues in the case. GA 2, 11.

At the status conference on September 13, 2002, the government and defense counsel requested that the trial date be postponed until September 25, 2002, a date requested by the

parties. GA 2.  While noting that the defendant wanted to delay the trial date further to become

more familiar with his attorney, defense counsel indicated that he did not need additional time

because of "any technical matters or investigation," since he believed that any needed preparation

could be undertaken within the contemplated schedule.  GA 2-3.   At the status conference, the

government observed that:

> Since Mr. Hopkins has been involved in the case, I've discussed the matter with him.  Today, for example, I met at length with him to go through various discovery, to go through exhibit lists, and to give him a pretty detailed understanding of exactly what the government is gonna be introducing.
>
> It was clear from our meeting today that Mr. Hopkins knows the file very well, has a very good appreciation of the factual issues and the legal issues that are involved.
>
> From the government's perspective, this is a relatively straightforward attempted bank robbery case, and that the two-day assessment for a time of trial is certainly realistic in light of the evidence.

GA 3.

The Court pointedly inquired whether the defense counsel could be ready to defend this

case on the anticipated schedule, and defense counsel assured the Court that he could.  GA 3-1.

On September 17, 2002, the parties picked a jury for the matter, at which time the Court

expressly inquired of defense counsel whether he had had an "adequate opportunity to spend with

Mr. Moriarty."  GA 3-13. Counsel indicated that he had, and the defendant agreed.  Id.  The

parties addressed the scheduling of various pending motions.

On September 19, 2002, the Court conducted a motions hearing on the matter, which

again reflected that defense counsel had an understanding of and a facility with the factual

record.  Defense counsel discussed a wide-range of pretrial motions, including seeking and

obtaining agent notes to use in potential cross-examination of government witnesses.  At that

hearing the government expressly moved for notice whether the defendant intended to raise an

alibi defense. GA 17. The government continued:

> The government has raised this issue informally a number of times by letter, and it's been the government's understanding, from representation of defense counsel, that defendant does not intend to make an alibi defense.

Id. The Court, with the defendant standing next to his counsel, specifically inquired of defense

counsel whether the government's understanding was correct, and defense counsel agreed that it

was. Id. 18. To drive the point home, the government continued:

> And then as a corollary matter to that, Your Honor, again, to the extent that the defendant testifies and would subsequently say on the stand, if pressed, blurt out some type of – Well, i[t] was – It's my understanding that if he does testify it would be by way of general denial, that, "I just didn't know where I was on that day, but I just wasn't at the bank." If, in fact, the defendant were to offer some explanation *that he was at a work site or in a bar or something like that*, the government, in light of the defendant being here today, would have grounds to cross-examine him relating to the fact that he had through counsel, asserted that there was not gonna be an alibi defense. I just wanted to alert the Court on that issue.

GA 18 (emphasis added).

Trial commenced on September 25, 2002. At the outset, defense counsel made clear that

"in all likelihood" his client would testify, GA 21, a position defense counsel reiterated at the end

of the first day of testimony when asked by the Court. GA 143-4. On September 25, 2002 and

on September 26, 2002, the record makes clear that defense counsel spent considerable time

cross-examining the government's witnesses raising a range of different approaches to attempt to

discredit them. See, e.g., GA 36-1 to GA 36-22 (cross-examination of detective Murphy); GA

118 to GA 143-4 (cross-examination of Gay, Sept. 25); GA 144-2 to 154-15 (portion of cross-

examination of Gay, Sept. 26); GA 196-207 (cross of Anderson).[1]  On Sept. 26, 2002, as anticipated, the defendant chose to testify.  In an unanticipated twist, during the course of his testimony, the defendant gave a detailed explanation of his whereabouts the day of the robbery, including putting forth an alibi that he thought he was at Scrupples, a bar, where he went "daily," GA 245, and in fact suggested he may have gotten a ride home from a barmaid named Shannon. GA 247.

On cross-examination, the defendant admitted that the government had previously requested notice from the defendant of any alibi defense and that, through counsel, the defendant indicated he would not be raising the defense.  GA 252-3.  During cross-examination, the government suggested that, had defendant given proper notice, the government could have investigated the alleged alibi (and proven or disproved it).  On the stand, the defendant explained that he had *not* offered *individual persons* as alibis, just indicated generally where he would have been on the date at issue. GA 252-3 to 252-4.

On September 27, 2002, after a two-and-a-half day jury trial, a jury returned verdicts of guilt against the defendant on both counts. GA 345.  On January 30, 2003, this Court sentenced the defendant to concurrent terms of 60 months of imprisonment on Count One and 240 months of imprisonment on Count Two.  GA 346.  The defendant filed a timely notice of appeal on February 6, 2003.  On February 9, 2004,  the United States Court of Appeals for the Second Circuit summarily affirmed. See Moriarty v. United States,  2004 WL 234872 (2nd Cir.(Conn.)).

---

[1]     Note that this cross-examination took 53 pages of actual transcript, which is not plainly reflected by the pagination method used for the attached Government's Appendix.

**Factual Background**

As the Court is aware, this prosecution resulted from an investigation of an attempted armed bank robbery of Fleet Bank in Wilton, Connecticut on January 13, 1998.  As discussed more fully below, the investigation was assisted by information provided by witnesses to the attempted bank robbery; the subsequent recovery of one of the vehicles used in the attempted robbery and items therein; information from two of the coconspirators in the robbery, who cooperated with the investigation and implicated the defendant; information provided by the defendant's ex-wife; and a range of other corroborative evidence, including statements by the defendant to a police officer acknowledging his participation in the attempted robbery, but not the extent of his involvement.

Count One of the indictment charged the overall conspiracy to rob Fleet Bank, encompassing the time period from January 9 through 13, 1998, and including, among other conduct, the attempted bank robbery itself on January 13, which formed the basis for Count Two. The government introduced evidence regarding the background events leading up to the conspiracy to rob the Fleet Bank in Wilton in January 1998.  The defendant's ex-wife testified that the defendant moved out of her house in November 1997, in anticipation of their divorce, and moved to a beach house in Milford, Connecticut. GA 63-64.  For the next five months, the defendant lived there with Kip Ferrari, who was renting the property. GA 73 (Stipulation).  The defendant's ex-wife testified that the defendant was in poor financial straits during the times at issue, which was corroborated by a financial statement signed by the defendant as part of his divorce in early January 1998.  GA 70-71. Because of the defendant's financial circumstances, his ex-wife rented a white van for him on her credit card in late 1997, which the defendant used

6

for transportation, kept at the beach house and, later testimony would establish, used as the lookout vehicle in the attempted robbery.  GA 66-69, 109, 112, 184-185, 199.

The government called as witnesses Kelly Gay and Jared Anderson, who cooperated in the investigation. Both had conspired with the defendant to commit the robbery and gave detailed and consistent versions of the events leading up to the attempted bank robbery, the robbery itself, and the defendant's leadership role in the crime. Gay and Anderson, 23 and 18 years old respectively at the time of the crime, admitted having serious past substance abuse problems. GA 75-78, 159.[2]  By the time of trial, both had rehabilitated themselves and testified lucidly about the events. See, e.g., GA 78, 159-162.

Gay testified that she met the defendant in late 1997 when she and her boyfriend, Scott Ferrari, moved into the small four-room beach house with the defendant and Kip Ferrari because of financial difficulties. GA 80, 82-85, 124, 169.  Gay testified that in early January 1998, while at the beach house, she overheard a conversation between the defendant, Kip Ferrari, and Scott Ferrari about robbing a bank near a police station, including a description of what each would do in the robbery. GA 91, 131. Thereafter she spent several days with an acquaintance, Jeff Kearney, in East Hartford. Both Gay and Anderson, who also spent one night at Kearney's apartment, confirmed that Kearney had an automobile, a Dodge Avenger, that Gay would borrow and for which she had kept a set of car keys. GA 92, 166-168, 174.

Both Gay and Anderson testified that, after the brief stay with Kearney, they stayed with the defendant, Scott and Kip Ferrari at the beach house for at least the four to five days before the

---

[2]     Anderson met Gay approximately six months before the robbery.  Anderson, who confessed to the crime and defendant's involvement before any grant of immunity, ultimately testified under an immunity grant.  GA 159, 162, 205-206.

robbery. GA 111, 130, 169. Just prior to January 9, 1998, the defendant, Kip and Scott Ferrari asked Gay to help steal Kearney's Dodge Avenger for use in a robbery, as she still had the keys. GA 92. Both Gay and Anderson testified that on January 9, Gay, Anderson, and Scott Ferrari went to East Hartford and stole the Dodge Avenger and returned with it to the beach house. GA 93-94, 132, 173-175.[3]

Anderson testified that on the morning of January 10, 1998, the day after stealing the Dodge Avenger, he overheard Gay, Scott Ferrari, Kip Ferrari and the defendant talk about robbing or casing a bank.[4] GA 177. Both Anderson and Gay testified that, on that same day, the defendant, Gay, Anderson, Kip Ferrari, and Scott Ferrari went to case and/or rob the Fleet Bank in Wilton: The defendant drove his van, Kip Ferrari drove the Dodge Avenger, and the rest were in Kip Ferrari's Cadillac. GA 94-95, 178. Their plan hit a snag in a Wilton commuter parking lot, the meet place after looking at the bank, when a Wilton police officer stopped the Cadillac for a

---

[3]     Jeff Kearney also testified and corroborated Gay and Anderson, by providing background details of their stay with him and the theft and recovery of his car. See, e.g., GA 212-215.

[4]     In addition to detailed testimony of Gay and Anderson and other evidence adduced at trial, the government produced or disclosed to defense counsel prior to trial a range of additional evidence, including investigative reports of interviews with Scott Ferrari describing the robbery conspiracy and his subsequent contacts with Kip Ferrari, a Scott/Kip Ferrari prison tape discussion referenced in the reports of interview, photographs of the crime scene, and a range of other evidence that supported the government's theory that the defendant, Gay, Anderson, Scott Ferrari and Kip Ferrari had been involved in the conspiracy to case and/or rob the bank. However, as discussed below, of these individuals, *only* the defendant Moriarty met the physical description of the tall coconspirator *in the bank* with Gay at the time of the January 13 robbery. This was a significant point the defendant plainly appreciated when he spun his story at trial, claiming that he had learned of details of the January 13 robbery from Kip Ferrari after the fact. Even in this story, it was his understanding that Kip had not been *in* the bank during the robbery -- making the key coconspirator in the bank a mysterious unknown and unnamed individual (who happened to meet the general physical characteristics of the defendant). GA 247-6 to 248.

motor vehicle violation; the officer subsequently arrested Scott Ferrari on an outstanding warrant on another matter. GA 96-97, 135-136, 179.  The police impounded the car, and Scott Ferrari remained in custody for a period of approximately a month, long after the January 13 attempted robbery, a fact also stipulated to by the parties. GA 97, 209-210 (Stipulation).

Gay testified that Kip Ferrari, after his relative's arrest and the impounding of his car, did not want to go through with the proposed bank robbery, and that Kip and the defendant argued about Kip's decision. GA 98, 137.  Anderson testified that the day before the robbery, Gay and the defendant approached Anderson to participate in the robbery as a lookout, as others were now not involved, and Anderson discussed with them details of his role and agreed to participate.  GA 180-183.   On January 13, 1998, the day of the robbery, the defendant told Gay that he was angry at Kip for backing out of the robbery attempt, that rent was overdue, and that both were in debt. GA 101. Both Gay and Anderson further testified that, just prior to the attempted robbery, the defendant talked with Anderson, discussing details regarding Anderson's role, including the use of  walkie-talkies.  GA 101, 183-184.

The defendant drove Gay in the Dodge Avenger to the Fleet Bank in Wilton. GA 110, 185.  Anderson drove the white van, which had been rented by the defendant's ex-wife. GA 109, 112, 185.  Using previously admitted bank photos as demonstrative aids, Gay testified to her recollection of the attempted robbery, including the defendant grabbing a woman and forcing her to open the bank, their movements within the bank, the defendant brandishing a gun and threatening the woman to open the safe, the defendant's reference to his walkie-talkie, and their exit when it became clear the woman could not open the safe. GA 102-109.  Gay also detailed the escape route and how the defendant, who was driving the car, crashed into a center island

when trying to make a turn and damaged the bottom of the car. GA 108-109.

Using previously admitted exterior photos of the bank as demonstrative aids, Anderson testified to acting as a lookout at the robbery, speaking with the defendant over a walkie-talkie, hearing the defendant threaten the teller, panicking, abandoning his lookout post, throwing his walkie-talkie away at a gas station, and later meeting up with the defendant and Gay at the pre-arranged meet site. GA 187-191.

The government called two other eyewitnesses to the robbery: Eileen Clemens and Heather Phillips. Eileen Clemens, the teller who had been forced to re-enter the bank, corroborated Gay's testimony regarding the details of the attempted robbery from the time the teller had been accosted in the parking lot until the two robbers in the bank fled the scene. GA 38-52. Phillips, who had witnessed part of the robbery from outside the bank at an ATM machine, also corroborated details of Gay's testimony. GA 54-61. Although the robbers were wearing masks, both Clemens and Phillips testified that the man who grabbed and threatened Clemens was approximately six feet three inches tall or between six feet two and six feet five inches tall. GA 45-46, 54, 58-59. The government had previously presented evidence that the defendant was approximately six feet three inches, and, of those mentioned by witnesses as potentially involved in the crime, the only individual over six feet tall. GA 24-27, 89.

Gay testified that after the attempted robbery Anderson was "freaked out" and left the beach house the next day; she had not talked with him since January 1998. GA 111, 117, 138. Anderson also testified that he had, since January 1998, completely disassociated himself from those at the beach house, including Gay. GA 194-196. Sometime after the robbery the defendant and Gay abandoned the Dodge Avenger in Wethersfield, Connecticut. GA 114-115. An officer

10

with the Wethersfield Police Department who recovered the abandoned car testified that it had

damage to the front bumper and fluid leaking from the underside. GA 217.  In that stolen car, the

one used by the defendant and Gay to flee the bank, the officer found a brown bag containing one

walkie-talkie, keys, and personal papers reflecting that they belonged to the defendant. GA 218-

220, 221.

The government called Sergeant Tim Murphy of the Norwalk Police Department who

testified that in the summer of 1999 he met and interviewed the defendant on four different dates.

GA 23, 29, 34, 36.  In each of the interviews, the defendant sought to implicate a local police

officer in illicit drug use and, as the story changed, either direct or indirect participation in a bank

robbery. GA 28, 30, 35-36.  In the second interview, the defendant directed the detective to

investigate an attempted bank robbery that took place in January 1998 at the Fleet Bank in

Wilton, giving particular details, including that the attempted robbery took place around "4:30

and 4:45 p.m" and that walkie-talkies were used.  GA 30. The detective testified that the

defendant explained that he (the defendant) "was involved in this bank robbery, although he did

not say to what extent." Id.[5]  The detective subsequently contacted the Federal Bureau of

Investigation and verified that an attempted robbery had occurred at Fleet Bank in Wilton,

Connecticut in January 1998; he also learned that walkie-talkies had been used, information that

---

[5]        The defendant later gave one reason for discussing the robbery with the detective,
namely, that  the defendant allegedly wanted to "settle a score" against the local police officer for
killing a pet exotic bird owned by the defendant's son, which the defendant's ex-wife had testified
the defendant had taken with him to the beach house. GA 35, 65.

had not been released to the public. GA 32-33.

At trial, after the presentation of the government's case, the defendant testified and corroborated many of the background details of Gay's and Anderson's testimony regarding events leading up to the day of the robbery.  He acknowledged that Scott and Kip Ferrari, Gay and Anderson were at the beach house during the relevant time period; that his ex-wife rented the white van for him; that, although claiming not to know how the one walkie-talkie got into the brown bag in the Avenger, the keys and papers found there were his and that he believed the bag itself was his. GA 233-234, 236-237, 249, 257. The defendant also admitted his involvement in a hypothetical conversation of how to rob the Fleet Bank in Wilton and that he used walkie-talkies for a carpentry job he had with Kip Ferrari.  GA 238-240.  The defendant also related his "version" of the events in detail, including that he did not participate in the robbery, that he purportedly obtained inside information regarding the robbery after the fact, and that he was at a bar during the time of the robbery, an alibi defense that he had previously failed to raise despite instruction to do so.  See generally GA 247-248.  The jury (and this Court) had a direct opportunity to hear the defendant's story and assess his credibility in light of the rest of the evidence adduced at trial.

## ARGUMENT

I.    Applicable Law for Ineffective Assistance of Counsel

To obtain collateral relief under 28 U.S.C. § 2255, the petitioner must show that his "sentence was imposed in violation of the Constitution or laws of the United States."  28 U.S.C. § 2255.  *Habeas corpus* relief is an extraordinary remedy and should only be granted where it is necessary to redress errors which, were they left intact, would "inherently result in a complete

12

miscarriage of justice." <u>Hill v. United States</u>, 368 U.S. 424, 428 (1962). The strictness of this standard embodies the recognition that collateral attack upon criminal convictions is "in tension with society's strong interest in [their] finality." <u>Ciak v. United States</u>, 59 F.3d 296, 301 (2d Cir. 1995). <u>See also</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 693-94 (1983) (recognizing the "profound importance of finality in criminal proceedings").

When evaluating claims that a convicted criminal was deprived effective assistance of counsel, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689. A defendant's *post hoc* accusations alone are not sufficient to overcome this strong presumption, as such a holding would lead to constant litigation by dissatisfied criminal defendants and harm the effectiveness, and potentially even the availability, of defense counsel. <u>See</u> <u>Id.</u>; <u>See also</u> <u>Korenfeld v. United States</u>, 451 F.2d 770, 775 (2d Cir. 1971), <u>cert</u>. <u>denied</u>, 406 U.S. 975 (1972) (holding that unsupported allegations by habeas petitioners are insufficient to support collateral relief). In light of the presumption in favor of counsel, the threshold for an ineffectiveness claim is *extremely high*, courts have "declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox, or downright ill-advised." <u>Tippens v. Walker</u>, 77 F.3d 682, 686 (2d Cir. 1996).

To prove a violation of his Sixth Amendment right to counsel based on his counsel's alleged ineffectiveness, the petitioner "must meet a difficult two-part test." <u>DeLuca v. Lord</u>, 77 F.3d 578, 584 (2d Cir.), <u>cert</u>. <u>denied</u>, 519 U.S. 824 (1996). He must establish both "(1) that counsel's performance fell below an objective standard of reasonableness, ... and (2) that there is a reasonable probability that, but for the deficiency, the outcome of the proceeding would have

been different." McKee v. United States, 167 F.3d 103, 106 (2d Cir. 1999) (quoting Strickland, 466 U.S. at 688, 694). The ultimate goal of the inquiry is not to second-guess decisions made by defense counsel; it is to ensure that the judicial proceeding is still worthy of confidence despite any potential imperfections, as "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." Roe v. Flores-Ortega, 528 U.S. 470, 481 (2000) (quoting United States v. Cronic, 466 U.S. 648, 658 (1984)).

In assessing the reasonableness of counsel's performance "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Showing merely that there were potential strategic errors or that some decisions were questionable is not sufficient as "[t]here are countless ways to provide effective assistance in any given case." Id. In order to prevail on the first prong of the Strickland test, therefore, the petitioner must conclusively show that, despite the strong presumption in favor of counsel, "under the totality of the circumstances, [Attorney Hopkins] failed to exercise the skills and diligence that a reasonably competent attorney would provide under similar circumstances." Boria v. Keane, 99 F.3d 492, 496 (2d Cir. 1996), cert. denied, 521 U.S. 1118 (1997). As a general rule, "the fact that counsel is prepared and familiar with the relevant facts and legal principles is usually sufficient to defeat a claim that trial counsel was ineffective." Farrington v. Senkowski, 19 F. Supp.2d 176, 179 (S.D.N.Y. 1998), aff'd, 214 F.3d 237 (2d Cir. 2000).

Even if the petitioner is able to make the difficult showing that his counsel's performance was objectively unreasonable and unprofessional, he still bears the burden of proving that the deficient performance "caused him substantial prejudice." To demonstrate such prejudice the petitioner must show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Hurel Guerrero v. United States, 186 F.3d 275, 282 (2d Cir. 1999) (quoting Strickland, 466 U.S. 687-88). More than just simple speculation about potential harms caused by counsel's actions is necessary to support a finding of prejudice. For prejudice to exist, the established and unprofessional errors of counsel must have been "sufficient to undermine confidence in the outcome." Jackson v. Leonardo, 162 F.3d 81, 85 n.9 (2d Cir. 1998) (quoting Strickland, 466 U.S. at 694). Conclusory, unsupported claims of ineffective assistance of counsel should be denied. See Sayre v. Anderson, 238 F.3d 631, 636 (5th Cir. 2001); see also United States v. Holmes, 44 F.3d 1150, 1158 (2d Cir. 1995); United States v. Simmons, 923 F.2d 934, 956 (2d Cir. 1991). To merely accuse counsel of "not being properly prepared, not having a direct case or strategy, and not cross-examining in an appropriate manner" does not focus sufficiently "on counsel's failures to permit a court to apply Strickland's second prong" and thus a defendant's claim must fail. Holmes, 44 F.3d at 1158.

15

II.  The Petitioner Has Not Established Ineffective Assistance of Counsel.

Defendant alleges certain failures to investigate and certain alleged trial errors, which fail to raise a colorable claim.

A.  Allegations of Constitutionally Ineffective Assistance of Counsel Pretrial.

1.  Alleged Failure to Conduct Independent Investigation
of Certain Alleged Alibi Witnesses

The defendant by his statements and actions (1) waived any claim relating to an alleged failure to investigate an alleged alibi or (2) alternatively, the defendant's own admissions reflect that defense counsel acted reasonably in not pursuing such a defense[6]:

First, when the trial court pointedly asked at jury selection, defense counsel and the defendant each expressly stated that they had had sufficient time to confer and neither indicated at that time that they were not prepared to proceed.  GA 3-13.   Hopkins had previously indicated he would be ready for trial, GA 2-3, 3-1, and the Court concurred that there was sufficient time to prepare for trial, GA 2-5 to 3-1.[7]   By his statements and conduct, the defendant waived any general claim regarding failure to investigate.

Second, on September 19, 2002, just prior to trial, the defendant was standing next to his counsel and discussing matters with him when the government in open court asked whether the defendant would advance an alibi defense, having learned from defense counsel various times

---

[6]     The defendant has also provided no explanation of which witnesses would have allegedly corroborated his claim and how they would have done so.  For this additional reason, his claim fails.  See cases cited supra at 13-15.

[7]     The defendant suggests in his Petition that he was somehow intimidated during the process.  As the trial court is well aware, in the manner the defendant conducted himself before, during and after trial, this defendant was able and willing to speak out to assert his rights.

16

before that defendant was *not* intending to make such a claim.  GA 17.  The Court pointedly

asked defense counsel, and defense counsel confirmed there would not be an alibi defense.  GA

17-18.  The defendant, no wall flower, let his attorney talk for him and did not raise any

independent objection.  To drive the point home, the government emphasized that:

> . . . as a corollary matter to that, Your Honor, again, to the extent that the defendant
> testifies and would subsequently say on the stand, if pressed, blurt out some type
> of–Well, I was–It's my understanding that if he does testify it would be by way of
> general denial, that, "I just didn't know where I was on that day, but I just wasn't at the
> bank."
>
> If, in fact, the defendant were to offer some explanation that he was at a work site or in a
> bar or something like that, the government, in light of the defendant being here today,
> would have grounds to cross-examine him relating to the fact that he had, through
> counsel, asserted that there was not gonna be an alibi defense.  I just wanted to alert the
> Court on that issue.

GA 18.  Again, after the government in detail laid out its concerns, the defendant did nothing to

change the parties' impression that he needed additional time to prove such a defense or would

otherwise be advancing such a defense.  Id.  Moreover, later at trial, on cross-examination after

advancing the defense, the defendant acknowledged his awareness of his duty to raise the defense

before trial.  GA 252-3.  He further acknowledged generally talking with counsel about the issue.

Id.  By his statements and conduct, the defendant waived any claim relating to alleged failures to

investigate an alibi.

Third, the government made clear in cross-examination that if *it* had been given notice

previously *the government* would have investigated the defendant's alibi to confirm whether it

was true or false.  GA 252-3 to 252-4.  Specifically the government pointedly asked the

defendant:

> [Y]ou knew that the government – one of the reasons the government proffered to the Court for why it wanted [notice of] an alibi defense, or actually a reason that would make sense, *is so that the government would have a chance to investigate the alibi.*

Id. 252-3 (emphasis added).  The defendant responded that "sure" that was what could have happened. Id.  But he then tried to justify his failure to give prior notice because "I didn't give *any particular person* I was with.  I just told you where I would have been on that day."  Id. 252-3 to 252-4 (emphasis added).   Thus, the defendant, by his own admission, suggested that the government's need to learn of an alleged alibi was unnecessary because any investigation to independently  corroborate the alibi would have been futile.

Under these circumstances, it is entirely reasonable for an attorney not to waste resources chasing purported witnesses that could be easily impeached to the detriment of the defendant's case.   In fact, it is a fair inference -- and in fact perhaps the only real inference -- from the defendant's own statements and conduct at and before trial that he was trying to game the system by not raising the alibi argument in a timely manner in order to deny the government an opportunity to investigate and disprove it.   The defendant simply cannot seek to benefit from his duplicity by now claiming that his attorney was ineffective in failing to undertake an investigation that would not have produced "any particular person" to corroborate his story or where the defendant made a calculated decision to surprise the government with the defense at trial.

### 2.  Failure to Obtain Additional Time to Prepare

To the extent the defendant makes a more general claim that he had insufficient time to prepare, that does not raise a colorable claim.  The amount of preparation that is required by the

18

Sixth Amendment's right to counsel is that which a given attorney in a given case needs to

perform in trial at a level reasonably in line with professional standards. See Strickland, 466 U.S.

at 688-689.  As the trial court was aware, this case was a relatively straightforward robbery case

which was scheduled to take -- and did take -- two days of testimony.   GA 3.  A defendant has

no right to have his trial conducted at the time of his choosing.  See Drake v. Portuondo, 321

F.3d 338, 344 (2d Cir. 2003) (holding that scheduling is committed to the sound discretion of the

trial court and "only an unreasoning and arbitrary insistence upon expeditiousness in the face of a

justifiable request for delay violates the Constitution" (internal quotation marks omitted)).   The

defense counsel indicated he could be prepared by trial and plainly was, as reflected by the

motions hearing on September 19, 2002 and defense counsel's detailed questions at trial.

     B.   Allegations of Ineffective Assistance of Counsel at Trial

          1.  Alleged Failures in Cross-examination.

The defendant further claims ineffective assistance based on his attorney's failure to

discredit prosecution witnesses who allegedly offered conflicting statements.  This claim is also

meritless.  As the Second Circuit has clearly stated, "the conduct of examination and cross-

examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record

should not second-guess such decisions unless there is no strategic or tactical justification for the

course given."  United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998); see also Dunham v.

Travis, 313 F.3d 724, 732 (2d Cir. 2002) ("Decisions about whether to engage in cross-

examination, and if so to what extent and in what manner are strategic in nature and generally

will not support an ineffective assistance claim." (internal quotation marks omitted)).   A review

of the trial record makes clear that defense counsel conducted vigorous cross-examinations of the various prosecution witnesses. Moreover, it was well within defense counsel's tactical discretion to pick and choose areas of attack. See United States v. Hon, 17 F.3d 21, 27 (2d Cir. 1994) (holding that counsel's decision not to question a witness about a given subject on cross examination was not ineffective assistance when the counsel was seeking to avoid further damaging testimony from the witness). Nersesian, 824 F.3d at 1321 (holding counsel's decision not to cross-examine was reasonable where cross-examination would likely have uncovered little new information and might have been counter-productive). Thus, reasonable bases clearly exist for the tactical decisions made by the defendant's counsel during cross-examination, and this claim of ineffective assistance fails.

2.  <u>Alleged Failures to Present Mitigating Evidence</u>

The defendant also alleges that his counsel failed to present all possible mitigating evidence, though he has failed to identity specifically what relevant evidence was omitted, and thus fails to meet his burden under both prongs of Strickland. See supra 13-15 (cases cited); Holmes, 44 F3d at 1158.

<u>_____</u>3.  <u>Alleged Failure to Call Two Unnamed Police Officers</u>.

The defendant has offered no explanation of which witnesses the defendant failed to call and why they were to be called and thus fails to meed his burden under Strickland. See supra 13-15 (cases cited); Holmes, 44 F3d at 1158.

4. <u>Allegations of Ineffective Assistance relating to the Defendant's Trial</u>
   <u>Testimony</u>

    a.   Allegedly Putting the Defendant in a Position Where He Had to Testify
   Apparently Because of Failures to Call Any Alibi Witnesses

The defendant claims that "against [his] wishes he had to testify a trial" because defense

counsel allegedly failed to call any witnesses, presumably the alibi witnesses referenced above.

Thus, the defendant appears to be rearguing the alleged failure to investigate and call alleged

alibi witnesses.  For the reasons discussed above, this claim fails.  <u>See</u> <u>supra</u> at 15-18.

Moreover, the defendant's decision to testify when faced with otherwise overwhelming evidence

of his guilt was an entirely rational act.  <u>See United States v. Jones</u>, 299 F.3d 103, 111 (2d Cir.

2002) ("[T]he fact that [the defendant] was required to choose between asserting his right to

silence and pursuing what he believed to be the most effective defense ... does not mean that [he]

faced the kind and intensity of coercion that could deprive him of the right against compelled

self-incrimination.").  Finally, as the record makes clear, while defense counsel appropriately did

not commit his client to testifying, from before the trial started and far from his present

protestations, the defendant appeared likely to testify -- it does not appear to be a decision that

the record suggests the defendant struggled to make.  <u>See</u> <u>supra</u> at 4.

    b.  Failing to Rebut Government's Questioning of the Defendant

The defendant claims that his counsel failed to "rebut" information brought out by the

prosecution's cross-examination of him.  Pet. Motion at 6-7.  This claim is also baseless.  <u>First</u>,

the defendant was able to tell his story, blame others for the crime and withstand cross-

examination.  It is not clear exactly what aspect of the government's rather truncated cross-

examination would have warranted rebuttal. Either the jury believed the defendant's explanation or it did not – and highlighting any damaging portion of cross-examination would only serve to highlight that aspect of the defendant's testimony. Second, as discussed supra at 12-15, decisions by counsel regarding the presentation of evidence and the questioning of witnesses are generally tactical and ought not be second-guessed by a reviewing court when, as here, they would constitute reasonable trial strategy. See, e.g., Strickland, 466 U.S. at 699; Eze, 321 F.3d at 136.

     5.  Alleged Failure to Object to Prosecutor's Statements Regarding the
           Defendant Allegedly Tailoring his Testimony

The defendant claims that his counsel failed to object to the government's suggestion either during cross-examination or during closings that defendant may have tailored his testimony to the testimony given by the various witnesses. The government's line of questioning and arguments at closing were appropriate. See Portuondo v. Agard, 529 U.S. 61, 63 (2000). Failure to make an objection that would not have been sustained is inherently reasonable and thus not evidence of ineffective assistance of counsel. See Diaz, 176 F.3d at 113; United States v. Booth, 994 F.2d 63, 68-69 (2d Cir. 1993); United States v. Caputo, 808 F.2d 963, 967 (2d Cir. 1987).[8] The defendant's claim on this ground is baseless.

## Conclusion

For the foregoing reasons, this petition for relief under 28 U.S.C. § 2255 should be dismissed. Furthermore, because the defendant has failed to make "a substantial showing of the

---

[8]    It is particularly hard to understand the defendant's claim where, as here, defense counsel *did* object to the government's assertion that the defendant might be tailoring his testimony. The government requested a cautionary instruction in the jury charge, and the Court gave such an instruction, even though the argument was in fact appropriate. GA 330-332.

denial of a constitutional right," 28 U.S.C. § 2253(c)(2) (2000), no certificate of appealability

should be issued.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

CHRISTOPHER W. SCHMEISSER
ASSISTANT UNITED STATES ATTORNEY

Federal Bar No.: ct14806
157 Church Street, 23rd Floor
New Haven, CT  06510
Tel.: (203) 821-3754
Fax: (203) 773-5377
christopher.schmeisser@usdoj.gov

CERTIFICATE OF SERVICE

This is to certify that a copy of the within and foregoing, and the Government's

Appendix, was sent, postage prepaid, by U.S. mail this the 18th day of April, 2005 to:

Michael Moriarty
Reg. # 14634-014
F.C.I. Otisville
P.O. Box 1000
Otisville, NY 10963

_____
Christopher W. Schmeisser     _____