United States District Court
District of Connecticut

United States of America : Criminal # 3:02 CR 90 (AHN)
        Plaintiff

                        : Civil #  3:05 CV 222 (AHN)

    V                   :

Michael P. Moriarty
        Defendant     : Date · August 1, 2005

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Memorandum of Law in Support
    of Section 2255 Petition

Comes now, the Defendant, Michael P. Moriarty
Reg # 14634-014, who is a Pro Se litigant in this
collateral proceeding. Defendant seeks relief
under Title 28 U.S.C. Section 2255 in the form
of his sentence vacated and remanded for
a new trial, as the result of a trial whose

outcome should not be relied on.

It is the intention of this memorandum of law to list, detail and show that his counsel Mr. Lawrence Hopkins, was ineffective as counsel guaranteed by the Sixth Amendment. It is well understood by the Defendant that an ineffective assistance claim must meet the criteria set-out in Washington v Strickland 80 L.ED. 2d 674. In that case, the Supreme Court reversed the court of appeals and held, "that a convicted defendant alleging ineffective assistance of counsel must show, not only that counsel was not functioning as the counsel guaranteed by the Sixth Amendment, so as to provide reasonably effective assistance, but also that

counsels errors were so serious as to deprive the Defendant of a fair trial because of a reasonable probability that, but for counsels unprofessional errors, the result would have been different.

It is clearly noted in the record of proceedings in this case, that there existed a serious conflict between Mr. Hopkins and the Defendant, at one point the Defendant wrote Judge Nevas to complain about lack of cooperation from Mr. Hopkins. Another time found the Defendant asking for removal of counsel for the sentence aspect of the proceedings. Inevitably, there was a complete breakdown in the attorney/client relationship.

In preparing for trial and during the trial itself, Mr. Hopkins used intimidation tactics to subdue the objections of the Defendant. He told the Defendant, "if you ask for new counsel now, that will infuriate the Judge since I'm the third attorney signed on to this case."

On Sept. 13, 2002 there was a hearing held for scheduling purposes and on that day, prior to entering the courtroom, Mr. Hopkins met with the Defendant and told him to ask for a 30 day postponment, but during the discussion counsel sold out his client by stating, "that the Defendant needed the time to feel more comfortable with counsel." That was a flat-out lie to the court.

At other times, counsel met the Defendants objections with the statement, "we don't want to piss off the judge, he's the one thats going to sentence you if we lose the trial."

Further, anytime the Defendant questioned Mr. Hopkins about his course of action he was told, "that he had more than 125 trials under his belt and to relax and let him handle things."

In the prosecutions Memorandum of Law, they talk the Defendants being vocal, eluding to the debate of Sept. 13, 2002. While that may be true, that doesn't mean that the Defendant was not intimidated by the cases proceeding and actual trial. The Defendant

didn't complain further to the court, because he didn't fully realize that he should, also he was worried about further alienating himself.

In United States v Gaders 47 L.ED.2d (1976) the court said, "the role of counsel is important precisely because ordinarily a defendant is ill equipped to understand and deal with the trial process without a lawyers guidance." By relying on the guidance of his counsel the Defendant finds himself appealing his conviction.

Before setting out the omissions, discrepencies and errors, the Defendant wishes to remind the court of two points of law.

First, unless the accused recieves the effective
assistance of counsel, "a serious risk of in-
justice infects the trial itself." Cuyler v Sullivan
64 L.ED.2d 333   Second, application of rule of
liberal construction of Pro Se pleadings just-
ifies interpertation of petition. Easterwood v
Champion 213 F.3d 1321, Bledsue v Johnson 188 F.3d 250,
Barnett v Hargett  174 F.3d 1128

## Factors of Ineffective Claim

At the first meeting between counsel and
the Defendant, which took place Sept, 10, 2002,
six weeks after appointment by the court, the
case was discussed for about two hours.
The Defendant explained his whereabouts on
the day in question, also possible witnesses in

formulating an alibi defense. This was dismissed out of hand by Mr. Hopkins by explaining, "this isn't T.V. you know." With repeated insistence by the Defendant this turned into a point of contention.

Five witnesses could have placed the Defendant elsewhere. A fact about the Defendants certainty as to his whereabouts should now be pointed out. The Bank Robbery took place six(6) days after the Defendants divorce became final in Bridgeport Family Court.

The Defendant was depressed over the divorce and spent weeks before and after drinking all day and night in one bar, called "Scruples"

He was there so often that the manager nick-
named him "Deep Pockets" and issued him a
"V.I.P." card, (no cover charges) something he said
he hadn't done in two years. Most of the bar
staff knew of the Defendants pending divorce
and discussed it with him at length.

The Defendants best friend at the time
would meet him every week day between 4 and
5pm at "Scruples" and most nights remain till
closing time.

Mr. Hopkins did not even place one phone
call to any of these possible witnesses to find
out what they could testify to. See United
States v Johnson 582 F. 2d 1186 Failure to interview
witnesses. Brown v Myers 137 F. 3d 1154 "Counsel

failed to investigate and present available testimony supporting petitioners alibi".

In Foster v Lockhart 9 F.3d 722, "counsels decision not to investigate potentially viable defense was unreasonable and could not be justified as a "tactical decision" to focus exclusively on an alternate defense".

In Strickland v Washington 693 F.2d 1243 the court concluded counsel must conduct a "reasonably substantial investigation" since there can be no strategic choice that renders such an investigation unnecessary.

"An accused has a constitutional right to compulsory process to produce witnesses in his behalf." Cutshall v Tollett 313 F. Supp 1330

United States v Hinton 631 F.2d 769 held, "the right to effective assistance of counsel means the right to a single minded advocate in the research of law and marshalling of arguments on defendants behalf."

Although a prior court case has no bearing on the instant case, the fact that the lead investigator, Sgt Timothy Murphy, in this case was also the lead investigator in a prior case against the Defendant is of significance.

In this robbery case now before the court the date of indictment was April 2, 2002. Just prior to this action, the Defendant was cleared in a major case on January 29, 2002 in

Stamford, Ct. Superior Court

In that case, Sgt (Detective) Murphy deliberately used misleading information, presented witnesses as "prudent & credible" when their arrest record would prove otherwise, produced a witness that he either knew was going to perjure himself, or at the very least should have known.

Specifically, on the application for an arrest warrant, Sgt. Murphy claimed to have "prudent and credible" witnesses against the Defendant. As it turns out (3) three of these "witnesses" had a total of 71 arrests on their record.

This application was filed in late 2001 and involved a homicide that happened in 1994. One of these "3 witnesses" could not

provide testimony in a court case, because
she was deported to her native Austria and was
dying of A.I.D.S. A fourth "witness" in the
application, also could not give testimony because
he was the victim in a homicide. Both the
deportation and the homicide occured in 1998,
three years before Sgt. Murphy applied for the
arrest warrant.

      Also contained in this application were
the statements from the two (2) eye witnesses
to the homicide, their physical descriptions
do _not_ _match_ the Defendant (Emphasis added)
Further, one of the eyewitnesses positively ident-
ified a vehicle _not_ _belonging_ to the De-
fendant, but that of an alternate suspect.

(Emphasis added.)

Lastly, as if adding insult to injury, another of Sgt. Murphy's "witnesses" at the probable cause hearing committed perjury and fabricated information claiming it to be a first-hand account of the night of the homicide.

It turns out that the information was garnered from the Defendant in a cell-block conversation that took place in winter 1999/2000. Because of this "witnesses" extensive arrest record (23 arrests) and the fact that he was a life-long resident of the city of Norwalk, Ct. (well known to the police) where Sgt. Murphy is employed, the Sgt. either knew or at least should have

known that his "witness" was lying.

The "witness" committed perjury at the probable cause hearing and this can be proven by the Defendant. While an inmate, the Defendant was able to obtain records from the State of Connecticut Department of Corrections, placing this witness 4 cells away from the Defendant in the same cell-block winter 1999/2000.

If an inmate can check into a witnesses claim, then how come a Detective from a Connecticut police force, who also happens to work part-time for the F.B.I.'s Fugitive Task force can't?

The witness offered information against the Defendant in exchange for being bailed

out of jail on a one hundred dollars bond. The possible sentence on the charge faced by the Defendant was 60 years. With a case involving this severe of a sentence, all possible avenues to verify or check the integrity of the claims, as well as the person making the statement, should have been covered. This however was not the case.

Three very specific details of the case did not ring true in the "witnesses" recounting to the police prior to their applying for an arrest warrant. These mistakes should have tipped off Sgt. Murphy as to the truthfulness of the "witnesses" rendition of the night in question. On the contrary, Sgt. Murphy

took his statement as the gospel truth and put this "witness" on the stand against the Defendant.

Sgt. Murphy would have you believe in this case, that it never dawned on him why a witness in a homicide case waited (7) seven years to come forward. Also, it never bothered him that (3) significant details were not even close to the truth. Lastly, that this "witness" totally fabricated a statement of hearing church bells ringing and none of this made them think to check his story out.

This discussion of the prior case is important because it clearly shows, not only Sgt. Murphy's overzealousness to charge the De-

fendant, but also the lengths to which he is willing to slant, bend, omit or deny the evidence to make it say what he wants to hear.

This behavior followed through into the Bank Robbery case, as can be shown in Sgt. Murphys testimony. He claimed that the Defendant admitted involvement in the robbery, "but it wasn't necessary to write this down in his notes, because a statement of that magnitude is not something he needs to be reminded of."

In impeaching Sgt. Murphy, Mr. Hopkins was able to get him to admit that his notes do not contain an admission by the Defendant

The problem the Defendant finds with this is; when a suspect in a case of major proportion (such as Bank Robbery) admits involvement, this is an admission of guilt, also known as a confession and the Defendant asserts that usually confessions are witnessed, sworn and signed by the suspect.

The Defendants belief is that this is the line of questioning Mr. Hopkins should have taken, instead Mr. Hopkins walks away from this area altogether. The impeachment by Mr. Hopkins was below reasonable competence for an attorney and does not show adequate preparation for a case of this magnitude.

In United States v Sellers 574 F. Supp 767 it was shown that counsel was not within range of competence required of attorneys in criminal cases, where defense counsel did not take advantage of significant opportunities to impeach prosecutions key witnesses and failed to check certain facts; thus, defendants motion to vacate was granted.

"Every defendant is entitled to a trial in which his interests are vigorously and con-scientously advocated by an able lawyer." Supreme Court Justice Marshall.

As Sgt. Murphy's testimony left the jury with the thought that a form of confession was made by the Defendant and Mr. Hopkins

only getting him to admit it wasn't written down, this ineffective impeachment of the first witness set the stage towards an unsure, fragmentary and disjointed defense.

Because of a lack of physical evidence in this case, the credibility of witnesses took on a more important role; therefore, it was the job of Mr. Hopkins to cast doubt on the prosecutions witnesses whenever possible. Showing that the lead investigator had in another case presented misleading information, claimed to have witnesses when they were either dead or dying in another country and as for the witnesses who were left, they were either

lying (which Defendant can prove) or their descriptions did not fit the Defendant. To omit this from the trial can hardly be shown as "sound trial strategy".

Sound trial strategy has to be considered "reasonable" after a "sufficient investigation" has occured. The Defendant was 43 years old at the time of the trial and faced a possible 25 year sentence, in essence, a life sentence. Mr. Hopkins duty to his client was to present any colorable, mitigating information as to the prosecutions witnesses. Omitting anything of value would be an abdication of advocacy.

Just these omissions and his ineffective cross-

examination of Sgt. Murphy and the prior case showing, should warrant a remand for a new trial itself.

United States Attorney Schmeesser points out very clearly, that the Defendant still holds the position of an alibi in his reply to the 2255 Petition. This is still the case and has been since day one.

Mr. Hopkins dismissed using an alibi defense out of hand without placing one phone call. In Holsomback v White 133 F.3d 1382 it was found that a counsels claim of strat-egic choice was rejected because an informed tactical decision could not be made without adequate investigation. Other than reading the

file that he received from the Public Defenders Office, Mr. Hopkins performed no external investigation whatsoever. Even the Public Defenders failed to check anything, although Mrs. Chambers had suggested otherwise. Short of a few hours of conversation with the Defendant, all information Mr. Hopkins has was provided by the prosecution.

In United States v Gray 878 F.2d 702, "Counsel prejudicially failed to hire investigators or conduct any pre trial investigation including contacting potential witnesses."

Other factors that should prove a deficiency in counsels performance are his

failure to highlight inconsistencies in witnesses testimonies.

Kelly Fry stated that the gun used was black or at least dark brown. The teller said it was chrome or silver. This discrepency was passed by Mr. Hopkins.

The witness at the A.T.M., Heather Phillips testified that she at one point was within 2 feet of the second suspect (Kelly Gay) separated by a clear glass door and that the suspect was about her height 5'6"-5'7"(at the trial prosecution added 1½"-2" for heels) to bring her height to 5'8"-5'9". In Kelly Gay's testimony she stated she was 6 foot tall even, without heels. How could you not

know someone 2 feet away is 4"-5" or more taller than yourself. Then as if this wasn't enough of a discrepency, Heather Phillips went on to state that from clear across the bank she could tell the first suspects (Defendants) height to within an inch, because she's familiar with the height - her brothers are that tall. Off by 4"-6" when 2 feet away, but accurate to within an inch 50 feet or more away. This was a little hard to swallow and counsel did a rather poor job of defending his client in this particular arena, as well.

The only logical statement Heather Phillips made was as she said the suspects leave

the bank she was able to judge that a half a foot or more difference in suspects heights. At least in this statement, comparison was her rule of measure.

Although counsel did broach this subject, his level of attention, at the least, leaves something to be desired. This witness was all too important because she and the teller were the only 2 eyewitnesses.

Counsel had the means to not only shake her credibility, but also to realism to the height factor. To explain; in her judging the 2 suspects heights individually, she didn't have a guideline or anything to compare to. But, when she saw the suspects leave the bank

all she needed was to see a difference in the 2 heights. This is alot easier to determine, when accuracy as to height differences is the objective. She stated that a half a foot or more existed. The actual difference between the Defendant and Kelly Gay is 3 inches and that not adding any height to Kelly for heels or etc. Presumably as important as O. J.'s glove!

The Defendant feels that this was the turning point in the trial. Physical evidence was at a minimum in this trial and to effectively impeach an eyewitness was crucial and the defense counsel performed again in a substandard way.

Although this may not be all too important in the overall scheme of things, since height was a major factor in this case, shouldn't accurate height measurements have been made to all parties, rather than relying on what they say.

Other factors to consider; the prosecution used the Defendants credit card balance of approximately $5,000.00 to establish a motive. Mr. Hopkins never countered that point, even though he knew well in advance about it. Again, counsels failure to prepare a defense; all he had to do was run a credit history on the Defendant and he would have

found that the Defendant carried this kind of balance for at least the previous 5 years.

As important as motive is to a prosecutors case, shouldn't an answer as simple as a credit check been performed by counsel? Especially, when counsel knew Defendants financial affadavit from his divorce was going to be introduced by the Defendants ex-wife.

As far as the ex-wife is concerned, she should have been called as a witness for the defense. She could have cleared up the credit card balance issue. Also, she could have explained how access to Defendants

bag of keys was obtained.

Telephone records should have been ob-
tained by counsel to help corroborate De-
fendants testimony.

As a final point, the Defendant would
like to stress strongly that in the F.B.I.'s
interviews with Kelly Gray and Jared Anderson,
that there existed a 20 month gap from Kelly's
first interview and Jared's interview. This was
plenty of time to get a story together.

Somehow, this hardly deserves being
mentioned by Mr. Hopkins and the jury
misses this piece of information. The Defen-
dant fails to see how this important fact can

be negated or omitted by counsel.

Finally, Kelly Gay brings the F.B.I. to the beach house, so they could dredge for the gun she said the Defendant disposed of. They found nothing — shouldn't defense counsel have made the jury aware of this fact?

This memorandum should show that Mr. Hopkins never took an offensive posture during the trial. How could he when he had no witnesses to call, except the Defendant, this allowed the Defendant prior criminal history to be exposed. Because of the ineffectiveness of his cross-examinations, he called the Defendant to the stand in a last ditch

effort to salvage the case. This point alone should show how the Defendant was pre-judiced.

The Defendant feels he has met the requirements of Stricklands two prong test to determine ineffective assistance of counsel and that a new trial is warranted, because the prior trials result should not be relied upon as having been just.

With the missing information contained within this discourse, at least one juror would have found reasonable doubt.

Respectfully Submitted

Michael P. Moriarty
Reg # 14634-014

## Certificate of Service

I, Michael Moriarty Reg #14638-014, do hereby certify that a true and accurate copy of this motion was mailed first-class postage pre-paid on August 1, 2005 to the address below.

Signed

Michael Moriarty
Reg #14634-014

United States Attorneys Office
157 Church St. 23 floor
New Haven, Ct 06510

Attn. U.S. attorney Schameissen



# STATE OF CONNECTICUT
## DEPARTMENT OF CORRECTION
### OSBORN CORRECTIONAL INSTITUTION
#### P. O. BOX 100
##### SOMERS, CONNECTICUT  06071

May 18, 2004

Mr. Joe McClure
Public Defender's Office
Stanford Superior Court
123 Hoyt Street
Stanford, CT 06905

Dear Mr. McClure:

RE: INMATES VANN, #68394, AND MORIARITY, #155269 – Housing Records

Per your request, the following information is provided regarding the housing assigned to the above-named individuals while incarcerated at Osborn Correctional Institution:

Inmate Vann, #68394, 12/6/99 – 1/10/00, C-34

Inmate Moriarity, #155269, 12/20/99 – 1/10/00, C-38

If you need any additional information, please feel free to contact me.

Sincerely,

Michael Phillips
Correctional Officer

MP/ns

**State Of Connecticut**
**Office of Public Defender**
**Stamford/Norwalk Judicial District**

**Investigator's Report**

## State v.    M. Moriarty

**Date: December 11, 2001**

**Attorney: S. Hankins**

Report:

    Attached please find the only MV and JIS records in the State of Connecticut for someone named Sean P. Burden, apparent witness in this case. The d.o.b.s 5/28/80 and Ct. Op. License #s 177009828 given match the subject whose residence was last reported to be 9 Christy Street in Norwalk. I was unable to locate Mr. Burden, which led me to check with the State's Medical Examiner's Office. They subsequently informed me that their records show that Sean P. Burden with the above d.o.b., resident of 9 Christy Street in Norwalk, was the victim of a homicide and he died in Norwalk on May 24, 1998.

**Investigator:**

**State Of Connecticut**
**Office of Public Defender**
**Stamford/Norwalk Judicial District**

**Investigator's Report**

# State v. M. Moriarty

**Date: December 7, 2001**

**Attorney: S. Hankins**

**Report:**
  This is to advise you that witness in this case—Susan Faber was deported from the U.S. to Austria, her native country, on March 17, 1998, according to INS.

**Investigator:** *H.G.M.*

**p.**

**State Of Connecticut**
**Office of Public Defender**
**Stamford/Norwalk Judicial District**

**Investigator's Report**

# State v. M. Moriarty

**Date: December 30, 2001**

**Attorney: S. Hankins**
**Report:**

For what it's worth, I compiled this record of warrant applicant's *"Prudent and Credible Witnesses"*:

| Witness | Year | Crimes Charged/Convicted |
|---|---|---|
| **Nancy Vega** | '90 | B.O.P.,Larc. 6, VOP |
| | '92 | Cr. Trespass 1, FTA 1 |
| | '93 | Prostitution, FTA 2 |
| | '95 | Sale Halluc., Possess. Halluc, Contr. Subst. Prohib.Place, FTA 1st |
| | '98 | Sale Halluc./Narc, Contr. Subst. Prohib. Place |
| **Everett Thompson** | '86 | Cred. Cd. Theft x2, Forgery 3, Larc. 5 |
| "Creed", "Terrence" | '86 | Larc. 1, Larc. 2 |
| *14 arrests* | '87 | Larc. 1 |
| | '89 | Larc. 1, Larc. 2 |
| | '89 | Larc. 2, Op. MV W/O Perm. |
| | '89 | Poss. Narc., Poss. WITS |
| | '91 | Op. Drug Factory, Sale Halluc./Narc. |
| | '91 | Poss. Narc. x 2, Sale Halluc. x 2 |
| | '91 | Poss. Narc., Sale Halluc. |
| | '91 | Asslt. 1, Asslt. 2 |
| | '93 | Op. MV Und. Susp., FTA 2 x2 |
| | '98 | Op. MV Und. Susp. |
| | '99 | R.O.I. Minor, B.O.P. |
| | '99 | B.O.P., Cr. Misch. 3, Vio. Prot. Order |
| **Susan Faber** | '78 | BOP |
| *31 arrests* | '81 | Larc. 2 |
| | '86 | Prostitution |
| | '86 | Larc. 6, Cr. Conspir., FTA 2 |
| | '86 | Prostitution |
| | '86 | FTA 2 |
| | '86 | Poss. Narc., Sale Halluc, Cr. Conspiracy |
| | '86 | Prostitution |
| | '86 | Larc. 6 |
| | '87 | Larc. 6 |
| | '87 | Larc. 6 |

**Investigator:**

**State Of Connecticut**
**Office of Public Defender**
**Stamford/Norwalk Judicial District**

**Investigator's Report**

continued …    <u>**Susan Faber**</u>

| | |
|---|---|
| '87 | Larc. 6 x2, Drug Paraphernalia |
| '87 | Larc. 6 x2, Drug Paraphernalia |
| '87 | Larc. 6 |
| '87 | Larc 6, FTA 2 |
| '88 | Larc. 6, FTA 1, FTA 2 |
| '88 | Larc. 6, FTA 1, FTA 2 |
| '88 | Larc. 6 |
| '88 | Larc. 6, Drug Parapher. |
| '88 | Prostitution |
| '89 | Larc. 6, FTA 2 |
| '89 | Larc. 6, FTA 2 |
| '89 | Larc. 6 |
| '89 | Larc. 6, FTA 2 |
| '90 | Larc. 6 |
| '90 | Poss. Narcotics |
| '90 | Prostitution |
| '90 | Prostitution |
| '91 | Cred. Card Theft, Cr. Card Fraud |
| '92 | Poss. Narc., Drugs Prohibited Place x2 |
| '94 | Prostitution |
| *'98— *Witness Deported from USA* | |

<u>**Richard C. Vann**</u>

*23 arrests*

| | [ *Dept. of Corrections—Disciplinary History* |
|---|---|
| '89 | *Disobey Direct Order* |
| '89 | *Program Violation* |
| '90 | *Disobey Direct Order, Fighting,* |
| '91 | *Program Violation* |
| '92 | *Disobey Direct Order* |
| '93 | *Public Indecency* |
| '98 | *Program Violation* ] |
| | |
| '75 | Larc. 3 |
| '78 | Asslt. 3, Larc. 3, Poss. Marj. |
| '78 | Cr. Misch. 3 |
| '85 | Threat., BOP |
| '85 | Larc. 5 |
| '88 | Sale Halluc., Poss. Narc., VOP |
| '88 | Poss. Narc., Poss. Parapher. |
| '88 | Poss. Narc. |
| '89 | Sale Halluc., Poss. Narc., Poss. Parapher. |
| '90 | Forgery 3, Larc. 6, FTA 2 |

**Investigator:**    *Mgm.*    p.

**State Of Connecticut**
**Office of Public Defender**
**Stamford/Norwalk Judicial District**

**Investigator's Report**

continued... **Richard C. Vann**

| | |
|---|---|
| '91 | Cr. Misch. 2 |
| '92 | Burgl. 3 |
| '94 | Larc. 4, FTA 2 |
| '94 | Larc. 5, Burgl. 3 x2 |
| '96 | Larceny 3 x2, VOP x3 |
| '96 | Poss. Drug/Marj. |
| '96 | Burgl. 3 |
| '99 | Burgl. 3, Cr. Tresp. 1st |
| '00 | Poss. Narc., Drugs Prohib. Place, FTA 1st |
| '00 | Cr. Tresp. 1st, Drug Parapher., Prohib. Place, FTA 1st |
| '00 | Drug Parapher., FA 1st |
| '01 | Larceny 5, Drug Parapher., Drugs Prohib. Place |
| '01 | Poss. Narc., Sale Ill. Drug, Drugs Prohib. Place x2 |

**Hope Tomlin**

| | |
|---|---|
| '94 | BOP, FTA 2 x2 |
| '94 | BOP, FTA 2 |
| '94 | Dis. Con., Cr. Misch.3 |
| '95 | BOP, FTA 2 |
| '95 | Dis. Con., FTA 2 |
| '96 | Rob. 1 x2, Asslt. Vict.60+, VOP, FTA 1 |
| '00 | False Statement x2, Rob. 2 x2, FTA 1, |
| '00 | Sale Halluc./Narc. |

**Investigator:**  *[signature]*                                                    **p.**

**APPEARANCE BOND**
JD-CR 4 Rev. 9-99
C.G.S. 53a-172, 53a-173, 54-2a, 54-63c,
54-63c, 54-63e, 54-64a, 54-64b, 54-64c, 54-66
P.B. Sec. 38-1,2,3,6,7,8,9,21, 43-2

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
*INSTRUCTIONS: Original to Clerk of Court and copy to Defendant.*

U2.6F

**TO: Any Proper Officer of the State of Connecticut**    68394

| FROM (Name of Defendant) | ADDRESS OF DEFENDANT (Include zip code) | TELEPHONE NO. |
|---|---|---|
| Vann, Richard | 156 E Ave, Norwalk, CT. | |
| JUDICIAL DISTRICT OR G.A. | ADDRESS OF COURT | |
| GA 20 | 17 Belden Ave | |

| CRIME(S) CHARGED AGAINST DEFENDANT | AMOUNT OF BOND | APPEARANCE DATE AND TIME (less than 14 days from arrest date) |
|---|---|---|
| 21a-267(a), 53a-125a, 21a-279(d) | $ 100.— | 8-1-01    9:00 A.M. |

I, the above-named Defendant, understand that I am being released from custody under the Amount of Bond set above.

I promise to appear before the above-named court on the Appearance Date and Time specified above and at any other place and time to which the charge(s) against me may be continued and in any other court to which the charge(s) against me may be transferred.

I also understand that I am being released on a:

☐ NON-SURETY BOND    ☐ SURETY BOND
☑ CASH BOND    ☐ REAL ESTATE BOND
☐ 10% CASH BOND (Must be authorized by a judge (P.B. § 38-4, 38-8))
☐ _____

in the above Amount of Bond, to insure my appearance as promised above, until final judgment is rendered.

**I ALSO UNDERSTAND THAT IF I FAIL TO APPEAR,** in accordance with the foregoing promises, I will be liable for the full Amount of Bond,

including forfeiture of any amount deposited, and I will be committing the crime of FAILURE TO APPEAR and be subject to the following penalties:
1. IMMEDIATE REARREST, OR ISSUANCE OF A CAPIAS.
2. ONE YEAR IN PRISON OR $2,000 FINE OR BOTH, if I am charged with a Misdemeanor(s).
FIVE YEARS IN PRISON OR $5,000 FINE or BOTH, if I am charged with a Felony(ies).

I also promise to satisfy all the special conditions stated below which were ordered by the court or a bail commissioner as a condition of my release on an Appearance Bond. I also understand that IF I FAIL TO SATISFY ANY OF THESE CONDITIONS THE COURT MAY MODIFY OR ADD ADDITIONAL CONDITIONS OR REVOKE MY RELEASE, AND IF I VIOLATE A CONDITION OF NO CONTACT OR NOT TO USE OR POSSESS A DANGEROUS WEAPON, I WILL BE SUBJECT TO ARREST FOR VIOLATION OF CONDITIONS OF RELEASE.

*I have read/have had read to me the notices on page 2 of this form and I understand the notices.*

**A. SPECIAL CONDITIONS OF RELEASE**
1. Do not commit a federal, state or local crime.

| SIGNED (Defendant) X Richard Vann | DATE SIGNED (mo., day, yr.) 7/1/01 |
|---|---|
| SIGNED (Parent or guardian if minor) | DATE SIGNED (mo., day, yr.) |

*The above information and statements were subscribed and sworn to before me.*

| SIGNED (Police Officer, Assistant Clerk) Rudolph Bol | DATE AND TIME SIGNED 7-1-01   11:25 A.M. | JOB TITLE Lieutenant | POLICE DEPT. (if applicable) DOC |
|---|---|---|---|

**COMPLETE THE APPROPRIATE SECTION BELOW IF A CASH, 10% CASH OR SURETY BOND IS REQUIRED**

**CASH BOND**

| AMOUNT OF BOND $ 100.— | TYPE OF BOND ☑ CASH ☐ 10% CASH | AMOUNT DEPOSITED IN WORDS One Hundred Dollars | AMOUNT IN NUMERALS $ 100.— |
|---|---|---|---|

DEPOSITED BY (Name, address, and zip code of Depositor) Murphy, Timothy J. Norwalk Police Dept. Norwalk, CT.    RECEIPT NO. 1866

| CASH TAKEN BY (Signature of Police Off., Bail Comm., Asst. Clerk) Shelton | DATE AND TIME BOND TAKEN 7-1-01   .M. | NAME OF JUDGE AUTHORIZING 10% BOND (if applicable) |
|---|---|---|

I, the Depositor, understand that if the above-named Defendant fails to appear in accordance with the foregoing promises, I WILL BE LIABLE FOR THE FULL AMOUNT OF BOND, including forfeiture of any Amount Deposited. I also understand that upon discharge of the Bond, as specified above, the Amount Deposited will be returned to the above-named Depositor, less any fee that may be required by statute.

| SIGNED (Depositor) X | DATE SIGNED 7-1-01 |
|---|---|

*The above information and statements were subscribed and sworn to before me.*

| SIGNED (Police Officer, Assistant Clerk) Shelton | DATE AND TIME SIGNED 7-1-01   11:00 A.M. | JOB TITLE P/O | POLICE DEPT. (if applicable) Bpt. C.C. |
|---|---|---|---|

**SURETY BOND**

| NAME OF SURETY | ADDRESS OF SURETY | TELEPHONE NO. |
|---|---|---|

| LICENSE NO. | TOTAL AMT OF BAIL LICENSED TO GIVE $ | TOTAL AMT NOW SURETY TO (Exclusive of this case) $ | FOR COURT USE FILE DATE |
|---|---|---|---|

I, the above-named Surety, understand that if the above-named Defendant fails to appear, in accordance with the foregoing promises, I will be liable to the State of Connecticut for the above Amount of Bond.

| SIGNED X | DATE SIGNED (mo., day, yr.) |
|---|---|

*The above information and statements were subscribed and sworn to before me.*

| SIGNED (Police Officer, Assistant Clerk) | DATE AND TIME SIGNED   .M. |
|---|---|
| JOB TITLE | POLICE DEPT. (If applicable) | SUPERIOR COURT DOCKET NO. S20N-CR01-0093619-S |

CONTINUED