## AFFIDAVIT OF LAWRENCE HOPKINS

**I, Lawrence Hopkins, being duly sworn, hereby depose and state as follows:**

1. I am an attorney, practicing in New Haven, Connecticut. I have been practicing criminal law for 23 years. For five of those years, I practiced as an Assistant Public Defender for Fairfield and Hartford Counties. I was the Public Defender for Hartford County the next five years. I have acted as defense counsel in over 100 criminal trials in state and federal court, and have represented a number of other clients who pled guilty in either state or federal court.

2. I was trial counsel in the matter *United States v. Michael Moriarty*, Crim. No. 3:02CR91(AHN), and submit this affidavit in response to the defendant Moriarty's claim that I fell below constitutionally mandated standards in my representation of him at trial. The following is a truncated summary of my representation of Mr. Moriarty, specifically responding to various allegations raised by him.

3. On April 2, 2002, a federal grand jury returned a two-count indictment against my client, charging him with two federal criminal offenses: conspiring with others from January 9 through 13, 1998, to rob the Fleet Bank in Wilton, Connecticut, and attempting to rob that bank on January 13, 1998. At the time of the arraignment, Moriarty was initially represented by the Federal Public Defender's office, which later withdrew from representation because of the illness of one attorney and the departure from the office of another. In August of 2002, I was appointed to represent Moriarty. After taking the case and independent of meeting with my client, I spent a lot of time reviewing the evidence. I contacted the government, and sought and obtained a wide range of investigative and police reports, 302s, other documents and evidence detailing the entire investigation, including investigative leads initially followed by the FBI and

then subsequent investigative steps, and interviews. I had a number of phone conversations with the government regarding the case, and, on several occasions, I met with the government to discuss the case at length, where I requested and obtained additional information. The government outlined in detail the case against my client and responses to range of potential defenses the defendant might try to raise, including strategic pitfalls of such defenses. The government discussed the potential of a guilty plea in light of the evidence and thought that such a resolution would be best for my client under the circumstances. Throughout the process, in part because of my prodding, the government conducted what was close to open file discovery regarding the relevant reports, photographs, interviews, etc., and made available to me other matters that might have tangentially related to the case, including one or more prison phone calls of alleged coconspirators who the government ultimately did not call at trial.

4. Having gained a close familiarity with the matter, I met with my client on several occasions and discussed the case at length. The defendant, like many clients who haven't seen cases play out at trial, initially suggested we might argue that he had been at one of the bars or strip clubs he was frequenting around the time of his divorce and the robbery. He claimed that a bartender at Scruples might remember him. We discussed the issue for some time. I pressed the defendant as to how could possibly remember where he was during the several minutes the robbery took place, as it took place over four years before. I also pressed him how he could possibly remember being at a specific bar. Under my questioning, he offered no explanation and, in fact, couldn't be certain he was at a specific bar, though he guessed he may have been at Scruples. I further pressed him on how it was conceivable that a bartender, even one who knew

2

of him, would be able to place him at the bar on the date and time at issue, given the events had taken place years before. Again he offered no explanation.

5. I then discussed with him the pitfalls of a weak alibi defense, that it could often put the defendant in a much worse situation if the alibi could be successfully impeached or inadequately corroborated. We discussed the issue for some time. Though there was certainly a lot of back and forth, we ultimately agreed that we would not advance the alibi argument and instead would advance a general denial that the defendant did not participate in the robbery, which is what we put on the record when asked by the Court at trial. Even when the defendant chose to testify on his own behalf, it was our understanding that the defendant would not try to advance an alibi, but simply explain he was not at the bank and had no involvement in the robbery. The defendant on his own when testifying decided to raise the alibi argument.

6. The defendant now claims that there was a best friend of his with him at Scrupples with whom he drank with every day starting between 4 and 5 pm for weeks after the dates of his divorce, which would have been at the time when the robbery took place. The defendant did not mention this friend or this aspect of his purported alibi to me during the time we prepared for trial or during trial, and, as I said before, we discussed the matter in detail.

7. In the manner the defendant discussed his purported alibi, the defendant sounded much like other clients I had represented that wanted to make something up in the misguided belief that it would ultimately help their case. Because the defendant gave no explanation how people could put him in a bar at the time in question, much less lacked certainty as to which bar he was at, and agreed with my analysis of the potential harms of an alibi defense, I felt and still feel the alibi approach would be immediately impeachable and play into the government's theory

3

that the defendant was depressed and desperate at the time, painting a picture of someone who would plausibly rob a bank. It was my belief, in light of my discussions with the defendant and careful review of the evidence, that under the circumstances it would be a fruitless effort to advance an alibi argument and ultimately harmful to the case.

8. The defendant tries now to suggest there was some type of conflict with us before and during trial. That simply was not the case. While he initially complained to the Court early in the process, we then had an opportunity to talk at length. While we certainly had animated discussions, by trial any differences were ironed out as I got an opportunity to get to know him, to prepare for trial and to discuss the approach. I believed that I developed a rapport with the defendant by the time of trial and was able to intelligently discuss trial strategy and proceed accordingly. The defendant's claim that I intimidated or coerced the defendant at any time in the process is simply not true. As the Court is aware, the defendant was not a person who could be intimidated.

9. At the status conference on September 13, 2002, the government and I requested that the trial date be postponed until September 25, 2002, a date requested by the parties. I noted that the defendant wanted to delay the trial date further to become more familiar with his attorney, which was the truth. It was my belief that I did not need additional time because of any technical matters or investigation and the preparation needed could be undertaken within the contemplated schedule.

10. On September 17, 2002, we picked a jury in the case. I had met with the client and we were prepared to proceed. The Court asked us whether we had an adequate opportunity to spend with the defendant, and I indicated that I had, which was the truth.

4

should have done things more aggressively. I think the trial record reflects that I took an aggressive approach and acted reasonably.

13. One area that the defendant criticizes now is my questioning of Sergeant Murphy. If one reviews the record, I plainly was seeking to cast doubt on the Sergeant's recollection of his interview of the defendant, in part based on some sketchiness of his notes from which he drafted his more formal reports. The defendant now claims that the approach I should have taken in cross was to suggest the Sergeant had been biased against the defendant because of a previous case involving the defendant, including that the prior state case had ultimately been dismissed.

14. I was aware of the state's prior murder case against the defendant both from my client, who lived through it, and from the government. I discussed the matter with my client and was aware that Detective Murphy had been involved in that investigation and had, in fact, learned of the robbery from the defendant while investigating the open murder. Putting aside that the state case was dropped long *after* the Sergeant interviewed the defendant and noted in his investigative reports that the defendant acknowledged some unspecified level of involvement in the 1998 robbery, I thought then and still believe that it would have been detrimental to cross-examine the Sergeant regarding the prior investigation to suggest bias. I believed there was a real potential for opening the door to the Sergeant testifying in response to my questions or on redirect regarding the defendant's alleged involvement in a prior murder. In fact, all involved in the trial had taken pains to avoid reference to the prior murder investigation to avoid any spill over prejudice.

15. Instead I tried to suggest that the Sergeant was mistaken as to the defendant's level of involvement with the robbery, leaving it to the jury to make any inferential leap that he was

6

11. On September 19, 2002, the Court conducted a motions hearing on the matter, where we argued relevant motions and discussed various trial issues. At the hearing, the government moved for notice whether the defendant intended to raise an alibi defense. I had previous conversations with the government, after having vetted the issue with my client, where I had explained that we did not intend to raise an alibi defense. At that motions hearing and consistent with my understanding with the defendant in light of my prior discussions with him, I said that we did not intend to raise such a defense. He certainly did not at the time suggest that my representation to the Court was not accurate and seem content with the litigation approach at the time.

12. In preparing for the trial I considered various approaches and their pitfalls. I felt that the best chance of success of getting a hung jury or acquittal was impeaching the two coconspirators who testified and suggesting that another unidentified individual was involved, as all the other named individuals other than my client did not appear to meet the physical description of the taller robber in the bank. (It should be noted that in our various meetings Moriarty did not offer any other person other than himself, including the various persons spending time at the beach house, who met the rough physical description of the unidentified robber in the bank.) I also felt that, if I could create some question on the height of the taller robber in the bank, it would open in the jury's mind a range of potential unnamed others who may have been involved in the robbery and were now being protected by the other two co-conspirators. The defendant was aware of my approach and did not object to it. I believe that the record, including extensive cross examination and closing argument, bears out that I advanced this strategy. The defendant, in hindsight, points to areas where he now thinks I

5

lying, or to suggest that the defendant had overstated involvement in the robbery to curry favor with the Sergeant on another matter. I believed that ultimately this approach a jury might find more receptive than a potentially less plausible approach of expressly accusing the Sergeant of lying with some long-standing vendetta against the defendant.

16. The defendant has suggested that I coerced him into testifying. From the outset of trial, the defendant suggested a possible desire to testify, and I explained to him that we did not want to commit to that approach initially for strategic reasons. We took a wait and see approach, and I ultimately explained to him the risks of testifying. I in no way coerced him to testify, and again, as the Court is well aware, the defendant has a strong personality and ultimately took his own counsel when he saw fit.

17. At the time and now in hindsight, I believe that I represented the defendant zealously in a difficult case.

The foregoing is true and correct to the best of my knowledge and belief.

_____
Lawrence Hopkins, Esq.

Sworn to and subscribed before me on this the 28th day of September, 2005

_____
Notary Public
My Commission Expires: July 31, 2008