```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

MICHAEL MORIARTY,                :
        Petitioner,              :
                                 :      Crim. No. 3:02cr91 (AHN)
v.                               :      Civ. No. 3:05cv222 (AHN)
                                 :
UNITED STATES OF AMERICA,        :
        Respondent.              :
```

RULING ON PETITION FOR A WRIT OF HABEAS CORPUS

On September 27, 2002, a jury convicted petitioner Michael Moriarty ("Moriarty") of one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and one count of attempted bank robbery, in violation of 18 U.S.C. § 2113(a). On January 30, 2003, the court sentenced Moriarty to 240-months imprisonment. Moriarty now petitions the court for a writ of habeas corpus [doc # 53] pursuant to 28 U.S.C. § 2255, alleging that he received ineffective assistance of counsel at his trial. The court determines that Moriarty's representation was not deficient or prejudicial to his defense under Strickland v. Washington, 466 U.S. 668 (1984), and therefore the petition for a writ of habeas corpus [doc # 53] is DENIED.

FACTS AND PROCEDURAL BACKGROUND

A.  The Bank Robbery

Moriarty's indictment and prosecution arose out of a botched January 13, 1998 robbery of the Fleet Bank in Wilton, Connecticut ("the Bank"). The evidence at trial demonstrated that Moriarty conspired with four others to attempt the robbery -- Kelly Gay

("Gay"), Jared Anderson ("Anderson"), Scott Ferrari, and Kip Ferrari.  In November 1997, Moriarty was experiencing marital difficulties; he separated from his wife and moved into a beach house in Milford, Connecticut, with Kip Ferrari.  Moriarty's wife, whom he divorced shortly before the robbery attempt, later testified that he was in poor financial straits at this time.

Gay, who cooperated with the government, testified that in early January 1998 she overheard Moriarty, Kip Ferrari, and Scott Ferrari talk about robbing a bank.  On January 9, 1998, Gay, Anderson, and Scott Ferrari went to East Hartford, Connecticut, and stole a Dodge Avenger automobile for use in the robbery.  The following day, all five co-conspirators drove to Wilton to case the Bank.  A police officer stopped one of the co-conspirators' vehicles for a motor vehicle violation and arrested Scott Ferrari on an outstanding warrant in another matter.  Scott Ferrari remained in custody for about the next month, missing the robbery attempt.  With Scott Ferrari in prison, Kip Ferrari decided to withdraw from the conspiracy as well.

Moriarty, Gay, and Anderson remained to attempt the robbery. On January 13, 1998, Moriarty and Gay drove to the Bank in the stolen Dodge Avenger; Anderson drove a white van that Moriarty's ex-wife had rented for Moriarty.  While Anderson served as a lookout for the robbery, Moriarty, who was wearing a mask at the time, accosted a teller outside the Bank.  After forcing the

teller to return to the Bank, Moriarty attempted to force her to open the safe.  Over his walkie-talkie, Anderson heard Moriarty threaten the bank teller; Anderson panicked and left his lookout post, throwing the walkie-talkie away.  Moriarty, when he realized that the teller could not open the safe, also abandoned the effort, jumped in the Dodge Avenger and, after crashing into the center island, drove away.  He abandoned the stolen automobile in Wethersfield, Connecticut.  A Wethersfield police officer found the vehicle with fluid leaking from its underside and a brown bag inside containing a walkie-talkie and personal papers tying Moriarty to the automobile.

    Sergeant Tim Murphy of the Norwalk Police Department testified that he interviewed Moriarty four times in the summer of 1999 regarding an unrelated mater -- a murder in which Moriarty was a suspect.  During the interviews Moriarty attempted to divert attention from the murder by accusing a local police officer of robbing the Fleet Blank in Wilton in January 1998.  He claimed that walkie-talkies were used in the bank robbery, a fact that had not been released to the public at the time.  Sergeant Murphy contacted the Federal Bureau of Investigation, which confirmed that the bank in question had been robbed in January 1998.  On April 2, 2002, a federal grand jury returned a two-count indictment charging Moriarty with conspiring to and attempting to rob the Bank.

B.  <u>Moriarty's Representation and Trial</u>

Moriarty was originally represented by the Federal Public Defender's office, which withdrew from representation because of the illness of one attorney and the departure from the office of another.  In August 2002, the court appointed Lawrence Hopkins, an experienced defense attorney, to assume Moriarty's representation.  Hopkins states in his affidavit that he contacted the government and sought and obtained a wide range of investigative and police reports, as well as other documents.

Hopkins also met with Moriarty on several occasions and discussed strategy for the trial at length.  Moriarty initially suggested that Hopkins pursue an alibi defense.  However, when pressed by Hopkins, Moriarty could not remember the specific bar he had been at on January 13, 1998, although he guessed he had been at a strip club called Scruples in Bridgeport.  Moriarty offered no explanation why the bartender or any patrons would remember that he was there during the late afternoon of the day the Bank was robbed well over four years before.

Hopkins vigorously opposed pursuing such a defense, and Moriarty eventually agreed that if he chose to testify in his own behalf, he would not claim an alibi at trial.  On September 19, 2002, the court held a motions hearing at which the government moved for notice of whether Moriarty intended to raise an alibi defense.  Hopkins, with Moriarty by his side, represented to the

court that his client did not intend to pursue an alibi defense. Nonetheless, at his trial seven days later, Moriarty, to the surprise of both the government and his own counsel, asserted that he thought he had been at Scruples during the robbery.

At Moriarty's two-day trial, the government presented the testimony of two of his co-conspirators, Gay and Anderson. Although the bank robbers wore ski masks, two other eyewitnesses identified one of the two as approximately Moriarty's height. Hopkins cross-examined all of the principal witnesses, including Gay, Anderson, and Sergeant Murphy.

The jury convicted Moriarty on both the conspiracy and attempted bank robbery counts. On January 30, 2003, the court sentenced Moriarty to 60-months imprisonment on the conspiracy count and 240-months imprisonment on the attempted bank robbery count, the sentences to run concurrently. Moriarty appealed his conviction, arguing that (1) this court improperly admitted evidence of his marijuana use with the co-conspirators, and (2) the government's summation urged the jury to convict Moriarty based on his prior criminal convictions. The Second Circuit rejected these arguments and affirmed the conviction. See United States v. Moriarty, 86 Fed. Appx. 474, 475 (2d Cir. 2004).

## DISCUSSION

Moriarty now contends that this court should vacate his conviction because he received ineffective assistance of counsel

at his trial.  To prevail as a habeas petitioner on a claim of constitutionally inadequate counsel, Moriarty must overcome the strong presumption that counsel provided effective assistance.  See Strickland, 466 U.S. at 689.  The Second Circuit has repeatedly "declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox or downright ill-advised."  See Loliscio v. Goord, 263 F.3d 178, 195 (2d Cir. 2001).  Under Strickland, a habeas petitioner claiming ineffective assistance of counsel must make a two-part showing.  First, the petitioner must demonstrate that counsel's performance was deficient -- that is, errors were made of such serious magnitude that the petitioner was deprived of the counsel guaranteed by the Sixth Amendment.  See Strickland, 466 U.S. at 687.  Second, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result would have been different.  See id. at 694.

Moriarty's challenges to the representation he received at trial may be distilled to three general contentions -- his counsel erred because he failed (1) to investigate potential alibi witnesses, (2) to cross-examine witnesses that gave allegedly contradictory statements, and (3) to prepare adequately for the trial.[1]  The government contends that Moriarty's counsel

---

[1] Moriarty also contends that counsel "intimidated" him by admonishing him not to "mak[e] enemies with the Judge," because the court would sentence Moriarty in the event he was convicted.

6

acted reasonably in failing to investigate potential alibis because such a defense would likely have been counterproductive under the facts of the case. The government also argues that counsel vigorously cross-examined the witnesses against Moriarty, and that counsel was adequately prepared for trial. The court agrees that Moriarty has failed to demonstrate that the representation he received was deficient under the Strickland standard.

### A. Failure to Raise an Alibi Defense

Moriarty contends that he received constitutionally inadequate representation because his counsel failed to investigate his claim that various witnesses could testify that he was at a Bridgeport strip club during the time when the Bank was robbed. The government points out that Moriarty never provided counsel with the names of potential witnesses, and that

---

Specifically, Moriarty claims that he wanted new counsel, but that Hopkins pointedly told him that the court would be reluctant to permit a third attorney to withdraw from representing Moriarty. Thus, he claims, Hopkins "sold out his client" by representing to the court that Moriarty needed a 30-day continuance, rather than new counsel, because Moriarty "needed the time to feel more comfortable with counsel."

Moriarty's contention that counsel coerced him is meritless. Hopkins states in his affidavit that he never intimidated or coerced Moriarty, and that Moriarty is "not a person who could be intimidated." At a more fundamental level, counsel has a professional duty to warn his client of the potentially adverse consequences of a particular course of conduct. Counsel's frank prediction as to how the court or a jury may respond to a defendant's conduct is hardly intimidation on the part of counsel.

7

Moriarty's proposed alibi defense was so flimsy that Hopkins was reasonable not to pursue it. The court agrees.

As the Supreme Court has explained, defense "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." See Wiggins v. Smith, 539 U.S. 510, 521 (2003)(quoting Strickland, 466 U.S. at 690- 91 (1984)). This duty to investigate is essential to the adversarial testing process because the testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies. See Greiner v. Wells, 417 F.3d 305, 320 (2d Cir. 2005). Counsel's decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. See Wiggins, 539 U.S. at 521-22 (quoting Strickland, 466 U.S. at 690-91).

Moriarty contends that his counsel acted unreasonably in refusing to investigate potential alibi witnesses. Moriarty, however, provided counsel virtually no leads to pursue. Although he has variously claimed that between five and eight witnesses could place him at Scruples at the time of the bank robbery, he never disclosed to counsel during the pendency of his trial, nor to the court in his § 2255 petition, the names or contact information of any of these putative witnesses. He never

mentioned to counsel that one of these supposed witnesses was his "best friend at the time."

Even if, as Moriarty suggests, counsel could have telephoned Scruples and inquired if any of the patrons could vouch for Moriarty's whereabouts at the time of the robbery, counsel's refusal to do so is far from unreasonable in these circumstances. When there is reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.  See Greiner, 417 F.3d at 321. Moriarty's counsel states in his affidavit that he believed it would be damaging to his client's interests to pursue an alibi defense at trial.  It must be remembered that Moriarty's trial did not begin until September 2002, more than four-and-a-half years after the robbery.  Counsel stated that Moriarty, although he now claims to have been at Scruples every weekday between 4 and 5 pm and most nights until closing time, was not sure shortly before his trial which bar he patronized on January 13, 1998, the day of the robbery.  Counsel presumed no more from Moriarty's putative witnesses, who could hardly be expected to remember whom they saw at Scruples during a brief window of time four-and-a-half years before.  Counsel was reasonable to believe that even if the alibi witnesses could be found, their testimony would be so easily impeached by the government as to undermine

the credibility of Moriarty's defense as a whole.

Counsel also points out that in addition to undermining Moriarty's credibility, the pursuit of an alibi defense would also have served to strengthen the government's argument about his motive. The government portrayed Moriarty as a desperate man who had amassed more than $5000 in credit card debt and whose divorce had become final six days before the robbery. Counsel acted entirely reasonably to suppose that a jury might find that Moriarty's frequent visits to a strip club, where he was known as "Deep Pockets" and by his own admission drank "day and night," would show that he was desperate man. Counsel knew that if Moriarty tried to assert an alibi defense, such damaging information would likely come out on cross-examination.

Counsel and Moriarty therefore agreed not to pursue an alibi defense at trial. Moriarty's claim that he was forced to take the stand to defend himself because counsel failed to establish his alibi through other witnesses is meritless. Counsel devised a trial strategy that was reasonable considering the weakness of Moriarty's position, and it was Moriarty who deviated from the strategy and attempted to raise an alibi defense on his own during the trial.

   B.  <u>Failure to Cross-Examine</u>

Ineffective assistance of counsel claims based on inadequate cross-examination are strongly disfavored. Decisions about

whether to engage in cross-examination, and if so to what extent and in what manner, are strategic in nature and generally will not support an ineffective assistance claim.  See Dunham v. Travis, 313 F.3d 724, 732 (2d Cir. 2002).  The "conduct of examination and cross-examination is entrusted to the judgment of the lawyer," and this court cannot second-guess the decisions of counsel on such matters "unless there is no strategic or tactical justification for the course taken."  See United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998).

    Moriarty attempts to surmount this high hurdle by claiming that counsel should have focused more on alleged inconsistencies in the testimony of Sergeant Murphy, in particular that the police officer's notes did not record that Moriarty admitted to involvement in the robbery, as Sergeant Murphy testified.  Counsel did cross-examine Sergeant Murphy regarding his notes.  However, counsel chose to suggest that Sergeant Murphy had misunderstood the level of Moriarty's involvement, rather than asserting, as Moriarty now claims he should have, that Sergeant Murphy fabricated evidence because of a personal vendetta against Moriarty.

    As the government points out, Moriarty's counsel acted entirely reasonably in pursing a less aggressive tack in his cross-examination of Sergeant Murphy.  Moriarty's claim of bias was based on Sergeant Murphy's supposedly overzealous pursuit of

Moriarty as a suspect in an August 1994 homicide in Norwalk. Moriarty's counsel, however, calculated that the jury would be less disturbed by Sergeant Murphy's zealous pursuit of a murder suspect than by the recitation of the facts that led him to believe that Moriarty was involved in that murder in the first place. Counsel realized that any attempt to demonstrate that Sergeant Murphy was biased would open the door to closer examination of Moriarty's involvement in the murder, and he made a professional judgment that this was not in the best interests of his client. Counsel's decision not to emphasize that Moriarty had been the suspect in a murder investigation, much like counsel's decision not to argue that Moriarty had been drinking at a strip club at the time of the robbery, was well within the range of trial tactics that this court will not second guess.[2]

    C.  <u>Failure to Adequately Prepare for Trial</u>

Moriarty also contends that counsel rendered ineffective representation because counsel did not adequately prepare for trial. He contends that the court appointed counsel on August 1,

---

[2] In his memorandum in support of his § 2255 petition, Moriarty lists other supposedly inconsistent statements of witnesses against him that counsel should have challenged on cross-examination, such as Gay's statement that the gun used was black or dark brown despite the bank teller's testimony that it was silver. Hopkins's affidavit does not explain why he pursued particular lines of questioning with some of these other witnesses, but the inconsistencies Moriarty cites were sufficiently trifling, and the other evidence against him sufficiently compelling, that Moriarty cannot establish prejudice on the grounds of the cross-examination strategy counsel pursued.

2002, but that counsel did not meet with him until September 10, 2002.  Although Moriarty claims that he wanted counsel to spend more time investigating his defense, counsel represented to the court that he was ready to proceed to trial.  The court thus conducted a motions hearing on September 19, 2002, and began the trial on September 25, 2002.

There is no indication whatsoever that Moriarty's counsel was unprepared for trial.  As the government points out, the trial presented a relatively straightforward prosecution for conspiracy and attempted bank robbery, with two of Moriarty's co-conspirators serving as cooperating witnesses.  Moriarty alleges that counsel should have devoted more time to "investigation work" -- presumably tracking down Moriarty's supposed alibi witnesses.  However, as the court has observed, counsel made a reasonable professional judgment that such an endeavor would be fruitless because any such witnesses could be easily impeached more than four-and-a-half years after the crime.

Moriarty offers no other specific evidence of counsel's lack of preparation, and thus he cannot demonstrate that counsel's performance was deficient or that Moriarty suffered prejudice.  See United States v. Holmes, 44 F.3d 1150, 1158 (2d Cir. 1995) (petitioner's lack of specificity in failure to prepare and other ineffective assistance claims prevents court from applying Strickland's prejudice prong).  As the record indicates, the

court was satisfied at the time of trial and remains satisfied that counsel was sufficiently prepared to proceed with Moriarty's defense.

## CONCLUSION

For the foregoing reasons, Moriarty's petition for a writ of habeas corpus [doc # 53] is DENIED.  Because petitioner fails to make a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue.  See 28 U.S.C. § 2253.

So ordered this 28th day of July, 2006, at Bridgeport, Connecticut.

_____/s/_____

Alan H. Nevas,
United States District Judge